IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CORLETTA ROSIE WATKINS, individually
and on behalf of all others similarly situated,

                              Plaintiffs,

v.                                                    CIVIL  ACTION  NO. 3:08-0132

WELLS FARGO HOME MORTGAGE,
a Division of Wells Fargo Bank, N.A.,

                              Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion for Relief from Judgment (doc. 25) and

Motion to Amend Complaint (doc. 33).  Based on the parties' briefs, and for the reasons discussed

below, the Court **GRANTS in part** Plaintiff's Motion to Amend Complaint, to the extent that

amendment is not futile.  The Court also **GRANTS in part** Plaintiff's Motion for Relief from

Judgment, to the extent that the Court has revised its analysis pertaining to field and conflict

preemption.

## I. Facts

Plaintiff Corletta Rosie Watkins refinanced her home through Defendant Wells Fargo in

September 2003, obtaining a loan for $43,350.  The loan was in the form of an "adjustable rate

mortgage" that allowed for fluctuations in the interest rate over the course of the loan, up to a

maximum of 12.625%.  As the interest rate rose, Plaintiff's payments likewise rose.  Ultimately, she

defaulted on the loan.

## II. Procedural Posture

On June 19, 2008, pursuant to a motion to dismiss by Defendant, the Court dismissed Counts I and II of Plaintiff's Amended Complaint. These claims had alleged an unconscionable contract. However, the Court did not dismiss Count III, alleging fraudulent loan origination.

Plaintiff filed a motion for relief from the judgment on June 20, 2008. On June 26, 2008, Plaintiff filed her Second Amended Complaint. The Second Amended Complaint changes several aspects of the previous Amended Complaint. It changes Count I from a class claim for unconscionable contract to a class claim for unconscionable conduct. It changes Count II from an individual claim for unconscionable contract to an individual claim for unconscionable inducement. Count III remains a claim for fraudulent origination. Finally, the Second Amended Complaint adds an entirely new claim, Count IV, claiming unconscionable inducement.

The Court has reviewed its opinion of June 19, 2008, and alters the preemption analysis contained therein. The Court also finds that many of the changes made in Plaintiff's Second Amended Complaint merit the Court's attention. These fact creates a somewhat unique procedural posture because, in light of Plaintiff's motions, the Court now is positioned to apply an altered preemption analysis to the allegations contained in Plaintiff's Second Amended Complaint. In the interest of properly and quickly advancing this case for a resolution on its merits, the Court now applies its reconsidered preemption analysis to Plaintiff's Second Amended Complaint.

To the extent that the substantive allegations of Plaintiff's Second Amended Complaint continue to be preempted, amendment is futile and these allegations flunk the test presented by Federal Rule of Civil Procedure 15(a). The Court notes that this case has stalled somewhat in recent months while the Court resolved the issues presented by preemption. Accordingly, in the interest

of avoiding further delay to the parties and the Court, the Court treats any preempted portions of Plaintiff's newly amended claims as dismissed.

### III. Legal Standard

Rule 15(a) provides that "[t]he court should freely give leave [to amend a complaint] when justice so requires."  Rule 15(a) should be construed "liberal[ly]," since it "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).   Therefore, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile."  *Laber*, 438 F.3d at 426.  In fact, if a trial court denies a motion to amend without finding prejudice, bad faith or futility, it abuses its discretion.  *Id.* at 429.  This standard applies regardless of whether the motion is filed prior to or after judgment: "[A] post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered–for prejudice, bad faith, or futility."  *Id.* at 427.  In addition to the requirements of Rule 15(a), Rule 16(b)(4) further provides that "[a] schedule may be modified only for good cause . . . ."

#### A. Prejudice

"Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing."  *Id.*  For instance, prejudice commonly arises when an amendment "raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered before or during trial."  *Id.*  (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th 1986)).  However, "an amendment is not prejudicial,

by contrast, if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." *Id.* "Delay alone . . .is [also] an insufficient reason to deny the plaintiff's motion to amend." *Id.* "For this reason, a district court may not deny such a motion simply because it has entered judgment against the plaintiff–be it a judgment of dismissal [or otherwise]." *Id.*

Defendant argues that Plaintiff's newly proposed Count IV will require it "to engage in a whole new round of motions practice . . . because . . . Count IV may have serious legal flaws." Specifically, Defendant alleges that Count IV may be preempted, that it may fail to adequate plead unconscionability under West Virginia law, and that it is no different from Count III. However, the Court addresses, and rejects, each of these arguments later in this opinion. Defendant also claims that Count IV may lack particularity under Rule 9(b), but in the Court's Order of June 19, 2008, the Court considered and rejected a similar attack on Count III, which Defendant alleges is substantially the same as Count IV. Of course, none of the Court's discussion here is intended to suggest that Defendant is not free to challenge the legal sufficiency of Count IV. However, the Court also cannot find that making such a challenge would constitute sufficient prejudice to Defendant so as to deprive Plaintiff of her right to amend her complaint.

The Court also notes that while Count IV "raises a new legal theory," it does not "require the gathering and analysis of facts not already considered by [Defendant]," since Count IV is based on the same alleged conduct as Count III. *Id.* Nor has it been "offered shortly before or during trial." *Id.* In fact, Plaintiff submitted her Second Amended Complaint less than a month after the deadline for amendment of pleadings. Furthermore, the Court has stayed the schedule for this case, and no deadline has been set for discovery. Any trial in this case would likely occur months from

now.  As stated, this Court cannot "deny . . . a motion to amend simply because it has entered judgment against the plaintiff . . . ."  *Id.*  Thus the Court finds that Defendant would not be prejudiced by allowing Plaintiff to amend.

### B. Bad faith

Plaintiff undoubtedly and understandably wishes to escape the Court's prior Order dismissing her first two counts.  However, just because Plaintiff seeks to avoid having much of her amended complaint dismissed does not change the standard under which her motion to amend is considered, since "a post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered–for prejudice, bad faith, or futility."  *Id.*  Thus to deny Plaintiff's motion, the Court still must find bad faith (or prejudice or futility).  However, there appears to be no indications of bad faith.  Although Defendant argues that Plaintiff lacks good cause for amendment, it does not argue that she seeks to amend in bad faith.  For example, there is no allegation that Plaintiff's motivation in bringing her motion is to delay a final adjudication of the case, harass Defendant or waste its resources.  As stated, the Court does not believe that Plaintiff's proposed amendments will delay the case or prejudice Defendant.  The Court also notes that Plaintiff did not dally in seeking to amend, but rather brought her motion within a week of the Court's order dismissing her unconscionable contract claims.  In short, a finding of bad faith is not appropriate under these circumstances.

### C. Futility

Defendant also argues that amendment of Counts I and II would be futile because the proposed counts "complain of the same thing as their predecessors–inadequate underwriting and explanations."  The Court acknowledges that Defendant's argument is understandable given the Court's finding of field and  conflict preemption in its previous order.  However, for reasons more fully discussed later in this opinion, the Court believes that proposed Counts I and II are not subject to conflict preemption in their entirety, and that field preemption does not apply at all.  Because the Court finds that portions of the newly amended counts are not preempted, amendment would not be futile.

### D. Good Cause

The Court reiterates that this case has not yet proceeded very far and that permitting Plaintiff to amend her Amended Complaint would not prejudice Defendant.  In light of these facts, and the unique circumstances presented by the Court's reconsideration of its previous preemption analysis, the Court finds that good cause exists to permit Plaintiff to amend her Amended Complaint.

### IV. Discussion

### A. Preemption of Unconscionability Claims Generally

As a threshold matter, Plaintiff contends that it is "axiomatic" that federal law cannot preempt common law contract defenses such as unconscionability.  Indeed, Plaintiff observes that "the Court concluded that Plaintiff's common law claim of fraud was not preempted" and insists that "there is no substantial difference in the character of the two contract defenses of fraud in the inducement and unconscionable conduct."  Apparently, Plaintiff continues to rely, in part, on 12

C.F.R. § 34.4(b): "State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers: (1) Contracts . . . ." In Plaintiff's view, "[b]y applying equity and unconscionability principles to national banks, courts do not more than incidentally affect the banks' ability to engage in real estate lending any more than applying fraud principles would."

Plaintiff cites *In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation*, 491 F.3d 638 (7th Cir. 2007), a case addressing preemption under the Home Owner's Loan Act (HOLA), for its "distinction between preempted claims and non-preempted common law claims." In that case, the court described its inquiry as "decid[ing] . . . which claims fall on the regulatory side of the ledger and which, for want of a better term, fall on the common law side." *Id*. at 644. Defendant agrees that the court's consideration of preemption under HOLA is "informative" and that it "provides a partial roadmap for this Court's consideration of [the preemption] issue." Still, Plaintiff reads *Ocwen* selectively, and she misapplies its fundamental inquiry as it pertains to the substance of her individual allegations.

Similar to the NBA, HOLA provides a list of types of state laws that "are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations" (the entities regulated by HOLA). *Compare* 12 C.F.R. § 34.4(b) *with* 12 C.F.R. § 560.2(c). Moreover, like the NBA's, HOLA's list includes contract law. *Compare* 12 C.F.R. § 34.4(b) *with* 12 C.F.R. § 560.2(c). Accordingly, the *Ocwen* court's discussion of preemption under HOLA is indeed useful to this Court:

> [T]he list of laws [in 12 C.F.R. § 560.2(c) ] that are not preempted[]
> is designed merely to preserve the traditional infrastructure of basic

-7-

state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations. The list in subsection (c) is long and the categories it covers–contract and commercial law, tort law, and so forth–are very broad. It would not do to let the broad standards characteristic of such fields morph into a scheme of state regulation of federal S&Ls. Hence the statement in subsection (c) that state laws escape preemption only to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section.

491 F.3d at 643 (internal citations and quotations omitted).

Defendant correctly reads *Ocwen*, and its summation merits repeating:

In the end, *Ocwen* overwhelmingly stands for the proposition that a court's analysis should focus on the substance of the allegation rather than what the claim is called. That a plaintiff calls a claim something one normally associates with contract or tort law does not save it from preemption if it complains of activities that are regulated, and therefore preempted, by the governing federal regulations.

. . . *Ocwen* very clearly states that if a state law is aimed at subject matter that the governing agency regulates–such as permissible terms, lending practices, and disclosures–that state law is preempted. However, if the specific allegation is aimed at things that are essentially claims for breach of contract or common law fraudulent misrepresentation, the state law claim may not be preempted.

In *Ocwen*, Judge Posner observed that "[t]he complaint [was] a hideous sprawling mess, 40 pages in length with 221 paragraphs of allegations," and a "monster." *Id.* at 641. He noted that the defendants should have either served contention interrogatories "to smoke out what exactly the plaintiffs [were] charging, or better, . . . the judge [should have] told the plaintiffs to specify the acts of the defendants that they [were] complaining about so that he could decide how much of the complaint was preempted." *Id.* Posner's approach in *Ocwen* is strong authority for the proposition that, in determining whether a claim is subject to conflict preemption, a court must look beyond the

-8-

shell of how a plaintiff styles a claim to get to the nut of exactly what defendant conduct the plaintiff alleges caused her harm.

With this approach in mind, clearly there is no more of a blanket prohibition against preemption of an "unconscionability" claim than there is of a "fraud" claim.  Whatever the claim, a court must look at the underlying allegations proffered in support of the claim and ask on which side of the *Ocwen* court's ledger they fall.  If the plaintiff truly complains of a term or practice outside the purview of the federal regulations, there is no preemption.  However, conflicting state regulation masquerading as a common law contract claim cannot be allowed to supplant existing federal regulations.

As an example, consider Plaintiff's assertion in support of her Count I claim that Defendant "fail[ed] to include the highest payment possible in the amortization schedules provided consumers." Plaintiff offers this alleged failure as evidence of "unconscionable conduct," the charge in Count I.  However, 12 C.F.R. § 226.19(b), governing disclosures, does not require that national banks "include the highest payment possible in the amortization schedules provided consumers." Furthermore, 12 C.F.R. § 34.4(a)(4) indicates that state laws pertaining to "schedule[s] for . . . amortization of loans" do not apply to national banks.  12 C.F.R. § 34.4(a)(9) similarly states that state laws pertaining to disclosures are also inapplicable.  That Plaintiff calls Defendant's "failure" to include this information "unconscionable conduct," and that no federal regulation governs unconscionability, cannot save this portion of Plaintiff's Count I claim from preemption.  In terms of substance, Plaintiff complains of conduct that is sanctioned by federal law, and these portions of Count I are therefore preempted.

**B. Preemption by National Bank Act**

Plaintiff argues that "[t]he United States Supreme Court has never held that the NBA preempts the field of real estate lending" and that the OCC has indicated that its regulations express no such intention.  She also argues that her claims of unconscionability do not conflict with any federal regulations, as no applicable regulations exist.  In Plaintiff's view, furthermore, any finding of preemption would leave borrowers without recourse against the lending practices alleged in this case and could lead to the foreclosure of hundreds of West Virginia homes.

Defendant counters that the National Bank Act and the OCC regulations promulgated thereunder occupy the field of real estate lending, to the exclusion of Plaintiff's unconscionability claims.  In Defendant's view, furthermore, Counts I, II and possibly IV are really attempts to displace federal regulations with state ones via the guise of "unconscionability."  Because these regulations conflict with federal regulations already in place, the former must naturally give way to the latter.

"The Supremacy Clause of the Constitution renders federal law 'the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Anderson v. Sara Lee Corp.,* 508 F.3d 181, 191 (4th Cir. 2007) (quoting U.S. Const. art. VI, cl. 2). "As a result, federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions." *Id.* (quoting *College Loan Corp. v. SLM Corp.,* 396 F.3d 588, 595 (4th Cir. 2005)).  "Federal law may preempt state law under the Supremacy Clause in three ways – by 'express preemption,' by 'field preemption,' or by 'conflict preemption.'" *Id.* (citing *Pinney v. Nokia, Inc.,* 402 F.3d 430, 453 (4th Cir. 2005)).  "[E]xpress preemption takes place when 'Congress expressly declares its intent to preempt state law.'" *Id.* at 191, n.10 (quoting *Pinney,* 402 F.3d at

-10-

453).  "[F]ield preemption occurs when Congress 'occupies the field' by regulating so pervasively that there is no room left for the states to supplement federal law." *Id.* at 191, n.10 (quoting *Cox v. Shalala,* 112 F.3d 151, 154 (4th Cir. 1997)).  Conflict preemption "occurs when state law actually conflicts with federal law." *Id.* at 191.

### 1. Field Preemption

"Field preemption may occur when the federal scheme of regulation of a defined field is so pervasive that Congress must have intended to leave *no* room for the states to supplement it." *City of Charleston, South Carolina v. A Fisherman's Best, Inc.,* 310 F.3d 155, 169 (4th Cir. 2002) (emphasis added).  In other words, field preemption occurs "where Congress has legislated comprehensively, thus occupying an *entire* field of regulation . . . ." *Louisiana Public Serv. Comm'n v. United States*, 476 U.S. 355, 368 (1986) (emphasis added).  *See also Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (finding field preemption where there is "an implicit congressional intent to displace *all* state law") (emphasis added).

The Court's Order of June 19, 2008, determined that Congress had left no room for state regulation and that field preemption therefore applied.  The Court hereby reverses its position as laid forth in that Order and finds that field preemption does not apply to the activities of national banks, because the  United States Supreme Court, the relevant federal regulations and the OCC itself all clearly envision some role, even if a limited one, for state regulation of national banks.  The Supreme Court has stated unequivocally that "[f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1567 (2007).  Indeed, "[t]he Supreme Court has only found three statutes to have the requisite

extraordinary preemptive force to support complete preemption: § 301 of the Labor-Management Relations Act, § 502(a) of the Employer Retirement Income Act, and §§ 85 and 86 of the National Bank Act [governing maximum interest rates] . . . ." *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005) (internal citations omitted).[1]  Tellingly, Defendant points to no case indicating that the National Bank Act preempts the field of real estate lending activities.  Rather, Defendant relies on *Watters* for the proposition that "Congress did not intend . . . 'to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation . . . .'" 127 S. Ct. at 1568 (quoting *Easton v. Iowa*, 188 U.S. 220, 229 (1903)).  While true, this statement does not mean that every state law affecting the activities of national banks is preempted, as the Supreme Court has affirmed.  *See Watters*, 127 S. Ct. at 1567.  *See also National State Bank v. Long*, 630 F.2d 981, 985 (3d Cir. 1980) ("[R]egulation of banking has been [a field] of dual control since the passage of the first National Bank Act in 1863.")*; Martinez v. Wells Fargo Bank, N.A.*, 2007 U.S. Dist. LEXIS 53171, at *5 (N.D. Cal. July 10, 2007) ("[T]here is no field preemption by the National Bank Act . . . ."); *Evans v. Fed. Reserve Bank of Philadelphia*, 2004 U.S. Dist. LEXIS 13265, at *5 (E.D. Pa. July 8, 2004) ("[T]here is a history of dual state and federal regulation of national banking institutions in this country.").

---

[1]Of course, complete preemption differs from field preemption in that the former "creates federal subject-matter jurisdiction over preempted state-law claims" while the latter "defeats a plaintiff's state-law claim because federal law 'occupies the field' within which the state-law claim falls . . . ." *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273 n.7 (2d Cir. 2005).  However, "both rest on the breadth, in some crude sense, of a federal statute's preemptive force." *Id.*  In this regard, consideration of whether complete preemption applies to the National Bank Act as a whole is enlightening.  If the National Bank Act, beyond §§ 85 and 86, does not "*so occup[y] the field* that any complaint alleging facts that come within [its] scope necessarily 'arise under' federal law" so that complete preemption applies, it is unlikely that it "*so occupies the field*" that field preemption would apply.  *Id.* (quoting 15 MARTIN H. REDISH, MOORE'S FEDERAL PRACTICE § 103.45 (3d ed. 1997) (emphasis in opinion).

Defendant claims that the federal regulations promulgated by the OCC, the body charged by Congress with regulation of national banks, establish field preemption, but these regulations explicitly allow some role for state regulation.  12 C.F.R. § 34.4, the regulation addressing the applicability of state laws, only states that those "state laws that obstruct, impair or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a).  Any fair reading of this regulation would have to conclude that state laws that do not so affect federally authorized real estate lending powers are not preempted, but, lest there be any doubt, the regulation goes on to name nine areas of law in which "[s]tate laws . . . apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers."  12 C.F.R. § 34(b).  Defining "incidentally affect" is not required for purposes of determining the existence of field preemption.  What is relevant for those purposes is only that some "state laws . . . apply to national banks . . . ."  *Id.*

Finally, Defendant acknowledges, indeed argues, that "[t]he OCC has the primary responsibility for surveillance of the business of banking authorized by [the NBA]," *Nat'l City Bank v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir. 2006), yet it ignores the OCC's clear statements that some level of state regulation is permitted, even expected.  In 2004, in testimony before the House Committee on Financial Services, the First Senior Deputy Comptroller and Chief Counsel of the OCC declared:

> [T]he preemption rule states that, except where made applicable by Federal law, state laws do not apply to national banks if they "obstruct, impair, or condition" the bank's exercise of powers granted under Federal law . . . .
>
> . . . .

-13-

> . . . . [W]hile we believe the text and history of the statute authorizing
> national banks' real estate lending activities (12 U.S.C. § 371)
> supports a conclusion that Congress authorized the OCC to occupy
> the field of national bank real estate lending through regulation, *we
> declined to do so* in the preemption rule and took a more targeted
> approach.[2]

*Congressional Review of OCC Preemption: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services*, 108th Cong. 2, 4 (2004) (statement of Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, Office of the Comptroller of the Currency) (emphasis added).  That "more targeted approach" is, of course, the preemption rule's allowance for state laws that do not "obstruct, impair or condition" a national bank's powers.  *See also id.* at 2 ("[O]ur rules . . . preserve the distinct roles of Federal and State regulators that define our dual banking system.").

### 2. Conflict Preemption

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law."  *Hillsborough County v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 713 (1985).  A conflict between state and federal law need not be direct, although that is one way in which a conflict will be found.  *City of Charleston, South Carolina v. A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002).  A conflict will also exist where "the particular state law . . . stands as an obstacle to the accomplishment of federal objectives."  *Id.*

No federal laws regulate unconscionable conduct or unconscionable inducement.  However, the Court must look at the alleged acts and practices of which Plaintiff complains.  To do otherwise

---

[2]The Court does not consider whether Congress has authorized field preemption.  The OCC's statement that it does not exercise field preemption satisfies the Court that it does not exist.

would be to allow Plaintiff to supercede the applicable federal regulations in the name of unconscionability, thus placing state law atop federal law.  Surely, declaring certain federally-sanctioned lending practices to be unconscionable places state law "as an obstacle to the accomplishment of federal objectives," to say the least.  *Id.*

### a. Count I

The federal regulations preempt some, but not all, of Count I.  Count I starts by alleging that "Defendant unconscionably induces consumers into agreements, specifically ARMs without regard to borrower's ability to pay, and suppressing in the inducement process the realities of future payments after reset."  Thus it appears that Plaintiff alleges here that the inducement to contract is unconscionable for three different reasons: (1) the agreements involve ARMs; (2) Defendant does not consider borrowers' ability to repay; and (3) Defendant "suppress[es] in the inducement process the realities of future payments after reset."

This first allegation is preempted because 12 C.F.R. § 34.21(a) unequivocally authorizes national banks to "make, . . .participate in, or otherwise deal in ARM loans . . . without regard to any State law limitations on those activities."  However, Plaintiff's second and third allegations are not preempted.  12 C.F.R. § 34.3(b) permits national banks to "use any reasonable method to determine a borrower's ability to repay," but Plaintiff's complaint that Defendant disregards borrowers' repayment ability does not ask this Court to declare unreasonable a particular type of method sanctioned by the regulations.  Rather, Plaintiff argues that Defendant employs *no* method in determining ability to repay.  Because Plaintiff does not here attempt to impose some regulation inconsistent with the federal ones, conflict preemption does not apply.  Nor is Plaintiff's third allegation preempted.  Here, Plaintiff claims that Defendant suppresses "the realities" of repaying the

loan, namely, that "Defendant makes such ARM loans with the belief that there is no reasonable probability of payment in full of the obligation."  While 12 C.F.R. §§ 34.4(a)(9), 226.19(b) govern the disclosures to accompany the type of loan extended to Plaintiff, neither authorizes a national bank to make a loan that it knows the borrower cannot repay, and certainly not to keep that information from the borrower.  Thus this claim is not preempted.

Plaintiff next attacks two "substantively unfair terms" included in the agreement, but both are addressed, and permitted by, federal law.  Plaintiff complains that the ARM's rate "adjust[s] upwards but . . . never go[es] below the initial rate."  However, 12 C.F.R. § 34.22 allows national banks to "increase the interest rate in accordance with applicable loan documents," while only stating that "[a] national bank *may* decrease the interest rate . . . ."  (emphasis added).  The other challenged term is Defendant's alleged "failure to include the highest payment possible in the amortization schedules provided consumers," but 12 C.F.R. § 226.19(b), governing disclosures, contains no such requirement.   Moreover, 12 C.F.R. § 34.4(a)(4) and (9) provide that state laws regarding, respectively,  "schedule[s] for . . . amortization of loans" and disclosures do not apply to national banks.

### b. Count II

Two of the allegations contained in Count II are not preempted.  Plaintiff begins Count II by alleging that "Defendant has engaged in a pattern of home equity skimming and predatory lending practices to make unfair loans in order to transfer . . . home equity from borrowers to . . . Defendant."  She also contends that Defendant misrepresented to her that certain "[f]inance charges . . . were . . . principal, thereby making [her] interest charges higher than represented."  No federal law permits a national bank to misrepresent to borrowers the nature of its charges.  Such conduct, therefore, may

be regulated by state law, and these allegations would make out a claim for unconscionable inducement.

On the other hand, the remaining two substantive allegations in Count II are preempted by federal law. Plaintiff complains of the ARM's "[e]xploding payment," but this allegation is little more than a rewording of Count I's general attack on dealing in ARMs, and it is likewise preempted by 12 C.F.R. § 34.21(a). Plaintiff also complains that her "loan cannot be refinanced," but 12 C.F.R. 34.4(a)(4) provides that national banks are not bound by "state law limitations concerning . . . terms of credit." Thus this allegation is also preempted.

### c. Count III

Defendant acknowledges that "the Court properly concluded that . . . Count III is not [preempted]" because it is "an allegation [that Defendant] knowingly misrepresent[ed] a material fact" rather than an "attack on the methodology employed in the appraisal process . . . ." Accordingly, no conflict exists between Count III and 12 C.F.R. §§ 34.41-34.47, governing appraisal standards.

### d. Count IV

For the same reason, 12 C.F.R. §§ 34.41-34.47 also do not preempt Count IV. (Indeed, according to Defendant, "it is unclear how [Count IV] is any different than Count III . . . .") Count IV alleges that "Defendant had a short list of rogue appraisers it intentionally used to provide bogus appraisals needed to originate inflated loans with unsuspecting consumers." This argument is far different than complaining about appraisal methodology, which is properly governed by 12 C.F.R. §§ 34.41-34.47. For example, Count IV does not contend that the appraisal was not in writing or that the appraiser lacked a license and certification. 12 C.F.R. § 34.44(b), (e). Rather, it complains that

-17-

"[t]he loan agreement with [Plaintiff] was part of a scheme to originate loans based . . . on an intentionally inflated appraisal."  Such a claim raises no conflict with 12 C.F.R. §§ 34.41-34.47.

### C. Count IV: Difference from Count III

Defendant complains that Count IV may "fail[] to properly plead unconscionability under state law" and that "it is unclear how it is any different than Count III," but these arguments are unavailing.  In West Virginia,

> The basic test [for unconscionability] is whether, in the light of the
> background and setting of the market, the needs of the particular
> trade or case, and the condition of the particular parties to the
> conduct . . . , the conduct involved is . . . so one sided as to be
> unconscionable under the circumstances existing at the time the
> conduct occurs . . . .

*Herrod v. First Republic Mortgage Corp.*, 625 S.E.2d 373, 379 (W. Va. 2005) (internal quotations omitted).  In the real estate lending market, both lenders and borrowers rely on the objectivity and neutrality of appraisers.  Where the borrower "is an unsophisticated consumer with little understanding of financial matters" and the lender "is a large national lender regularly engaged in the business of arranging real estate loans," as alleged here, the borrower is particularly vulnerable to an inflated appraisal.  Moreover, Plaintiff's claim that Defendant and the appraiser effectively conspired to induce her to enter into an inflated loan via an inflated appraisal alleges conduct sufficiently "one sided as to be unconscionable."  *Herrod*, 625 S.E.2d at 379.  Thus, contrary to Defendant's assertion, Plaintiff does not "fail[] to properly plead unconscionability under state law."

Defendant also suggests that Count IV may be "simply an allegation of fraud" and therefore not "any different from Count III."  Although the alleged conduct at issue in both Counts

III and IV may be similar or even the same, the unconscionability and fraud claims do differ.

Primarily, Count IV complains of the one-sidedness of the loan origination process, while Count

III complains of its falsity.  Fraud, the claim in Count III, requires the following elements:

> (1) that the act claimed to be fraudulent was the act of the defendant
> or induced by him; (2) that it was material and false; that plaintiff
> relied upon it and was justified under the circumstances in relying
> upon it; and (3) that he was damaged because he relied upon it.

Highmark W. Va., Inc. v. Jamie, 655 S.E.2d 509, 515 (W. Va. 2007) (quoting *Horton v. Tyree*,

139 S.E.2d 737, 738 (W. Va. 1927)).  These elements differ from the unconscionability test

described above, and Counts III and IV present distinct claims.


## V. Conclusion

For the reasons discussed above, the Court **GRANTS in part** Plaintiff's Motion to Amend

Complaint, to the extent that amendment is not dismissed herein as futile.  The Court also **GRANTS**

**in part** Plaintiff's Motion for Relief from Judgment, to the extent that the Court has revised its

analysis pertaining to field and conflict preemption.

The Court **DIRECTS** the Clerk to send a copy of this written Order and Opinion to counsel

of record and any unrepresented parties.

ENTER: November 5, 2008

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE